# UNITED STATES DISTRICT COURT

_____ NORTHERN _____ DISTRICT OF ___ ILLINOIS, EASTERN DIVISION ___

UNITED STATES OF AMERICA

v.

RONALD PIEKARZ and MACARTHUR MILAM

**F I L E D**

MAY 2 1 2008
May 21, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNDER SEAL

MAGISTRATE JUDGE ASHMAN

CRIMINAL COMPLAINT
CASE NUMBER:

**08CR    405**

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

Beginning no later than in or about October 2007 and continuing until at least in or about December 2007, in Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendants RONALD PIEKARZ and MACARTHUR MILAM, did conspire with each other and others to commit bribery in violation of Title 18, United States Code, Section 666;

All in violation of Title 18, United States Code, Section 371.

I further state that I am a Special Agent, Federal Bureau of Investigation, and that this complaint is based on the following facts:

See Attached Affidavit

Continued on the attached sheet and made a part hereof:  __X__ Yes    ____ No

Signature of Complainant

Sworn to before me and subscribed in my presence,

May 21, 2008
Date

at    Chicago, Illinois
City and State

Hon. Martin Ashman, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT

I, Tom Simon, being duly sworn under oath, depose and state as follows:

### I.    BACKGROUND OF AFFIANT

1.    I am currently assigned as a Special Agent with the Federal Bureau of Investigation ("FBI"), Chicago Division. I have been an FBI Special Agent for over 12 years and am assigned to a public corruption squad where I investigate criminal violations by federal, state and local public officials. During my time as an FBI agent, I have received training and participated in all normal methods of investigation and, including, but not limited to, visual and electronic surveillance, the questioning of witnesses and the use of informants, and undercover operations. I have also received training in the enforcement of laws concerning, among other things, public corruption and white collar crime.

### II.    PURPOSE OF AFFIDAVIT

2.    This affidavit is made for the limited purpose of establishing probable cause in support of a criminal complaint charging that beginning no later than in or about October 2007 and continuing until at least in or about December 2007, RONALD PIEKARZ and MACARTHUR MILAM conspired with Beny Garneata, Phyllis Mendenhall and others to commit bribery in violation of Title 18, United States Code, Section, 666(a), all in violation of Title 18, United States Code, Section 371.[1]

3.    More specifically, RONALD PIEKARZ is an architect who works with developer/contractor Beny Garneata on building projects. PIEKARZ assists Garneata in a variety of ways with the payment of bribes to City inspectors in exchange for the City inspectors providing

---

[1]Garneata and Mendenhall have been charged in separate federal criminal complaints.

favorable treatment on projects of Garneata's and PIEKARZ's. MACARTHUR MILAM is a supervisory ventilation and furnace inspector who received at least two different bribes from Garneata assisted by PIEKARZ. In particular, investigators intercepted phone calls on a wiretap of a phone used by Garneata. Conversations, including calls between Garneata and PIEKARZ and Garneata and MILAM, demonstrated that Garneata and PIEKARZ provided a bribe to MILAM in the form of labor for the installation of glass block windows and an outdoor deck for MILAM's home. PIEKARZ and Garneata provided the bribe in exchange for continued favorable treatment from MILAM, including ensuring a favorable ventilation inspection on a property located at 6240 South Troy in Chicago. Additionally, PIEKARZ contributed and assisted Garneata with the payment of bribes to inspectors during the Christmas holidays ("December bribes"), including a December bribe provided to MILAM, provided in exchange for continued favorable treatment. Finally, PIEKARZ also contributed and assisted Garneata with providing bribes to inspectors in the form of tickets to sporting events.

     4.     This investigation has been jointly conducted by the United States Postal Inspection Service ("USPIS"), the City of Chicago Office of the Inspector General ("IG")and the FBI. The information contained in this Affidavit is based on my personal knowledge as well as information obtained from other law enforcement agents participating in the investigation, cooperating witnesses, documents, and recorded conversations. Since this Affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that PIEKARZ and MILAM committed a violation of Title 18, United States Code, Section 666, all in violation of Title 18, United States

Code, Section 371.

## III.  EXPLANATION OF THE BUILDING PERMIT PROCESS AND CITY DEPARTMENTS

5.      The process for issuing building permits and monitoring construction projects is governed by several departments within the City of Chicago, including the Department of Zoning ("Zoning"), the Department of Construction and Permits ("DCAP"), the Department of Buildings ("Buildings") and the Department of Administrative Hearings ("AH").

6.      The principal role of Zoning is to enforce Chicago's Zoning Ordinance, to implement the city's land use policies and to maintain and update the city's official zoning maps. Developers seeking to obtain a building permit for new construction and renovation projects which require architecture plans receive an initial review of their architectural plans in Zoning to assure that the project conforms to the official zoning and land use policies of the City of Chicago. Zoning reviews the survey plats, parking lot layouts and site plans to ensure that projects conform to the Zoning Ordinance. When a proposed development is not in compliance with the Zoning Ordinance or permitted use, a developer has the option of seeking an administrative adjustment or a zoning variance. The administrative adjustment process is a streamlined procedure for minor modifications of selected zoning standards. The zoning variance procedures involve review and approval of the requested changes by the Zoning Board of Appeals. Zoning is also responsible for administering the landscape ordinance within the zoning code which governs landscaping of all business, commercial and large residential projects. In addition, zoning is responsible for issuing Certificates of Occupancy (a certificate from the City certifying that a structure is fit for human habitation) for construction projects containing between one to three dwelling units and for issuing Zoning

3

Compliance Certificates (a certificate from the City certifying that a structure meets the applicable zoning requirements) for the occupancy, use, or change of use of any property in the city. Projects receive an initial review in Zoning by a zoning plan examiner ("ZPE"). On-site investigation of projects to ensure compliance with the Zoning Ordinance, including the landscape ordinance, and Certificate of Occupancy reviews are performed by zoning inspectors.

7.    DCAP is responsible for issuing construction permits. Prior to the creation of DCAP in April 2003, construction permits were issued by Buildings. A permit application must include the names and City license numbers of the general contractor and each subcontractor who intends to work on the construction project. To obtain a general contractor's license from the City, an applicant must mail a license application to an address maintained by the Department of Buildings. License applications must be renewed by mail every year. Generally, the construction permit application process follows one of three different tracks: the Easy Permit Process ("EPP"), Standard Review Plan process, or Developer Services process. EPP is used to obtain construction permits for repair or replacement of existing elements of a building, when no structural changes to the building will be made. Standard Review Plan (also referred to as Open Plan Review) is used to obtain construction permits for small to mid-sized construction and renovation projects requiring architectural drawings. The Standard Review Plan process involves an initial assessment of a construction project by a DCAP project manager. After the project manager review, the architectural plans receive technical reviews of appropriate disciplines which include, among others, electrical, plumbing, ventilation, structural, architectural, landscape and fire prevention. The purpose of each discipline review is to ensure that the proposed project is in conformance with the building codes and regulations of the City of Chicago. The Developer Services process is used to obtain

4

construction permits for large and complex projects. In January 2008, DCAP merged back into the Buildings Department.

8.    Buildings is responsible for the enforcement of the Chicago Building Code governing the construction, rehabilitation and maintenance of structures within the City of Chicago. Within Buildings is the New Construction Bureau. New construction inspectors' primary role is to perform inspections to ensure that construction and renovation work conforms to the permits that have been issued by DCAP. Building inspectors can also respond to complaints regarding structures, including emergencies that occur after working hours, and they can issue violation notices to building owners when a structure is not in conformance with the Building Code. Inspections can also be generated by the public by dialing 311, the non-emergency number for city services. Inspectors can also issue "stop work orders" to stop any construction that is done without a permit, contrary to an approved permit, and other forms of construction that poses a threat to the health and safety of the public. A stop work order is a directive from the Department of Buildings, addressed to the owner of property on which construction or demolition work is proceeding without proper authorization. The stop work order prohibits further work, and in some cases requests the removal of work already completed, until or unless an appropriate construction permit has been obtained. There are different procedures for releasing each kind of stop work order, which can include paying fines and/or paying additional permit fees. Some releases can occur at the City's satellite offices (additional offices located in various neighborhoods for the convenience of property owners and developers), while others involve the applicant presenting the plans and application to the DCAP or to another Department, usually at City Hall. Inspectors sign the back of a contractor's construction permit when an inspection is performed and the inspector determines that the completed work is within the requirements of the

Building Code and the scope of the construction permit. Certificates of Occupancy for construction and renovation projects involving four or more units are also issued by Buildings. Building Inspectors conduct inspections of projects prior to the issuance of Certificates of Occupancy. Finally, Buildings has historically maintained a mainframe computer database that contains information about buildings in the City of Chicago, including the number of original units in each building.

9.      AH serves as a quasi-judicial tribunal for the expedient, independent and impartial adjudication of municipal ordinance violations. AH has several divisions, including a Building Division. The purpose of the Building Division is to adjudicate cases initiated by the Buildings, Fire and Zoning departments.

10.     Contractors, developers, and homeowners may hire a permit expediter to facilitate the construction permit application process. The services performed by a permit expediter include, among other things: completing construction permit application forms; collecting and submitting relevant documents to DCAP and Zoning; waiting in line at City Hall for plan reviews; scheduling building inspections; meeting with architects, contractors, developers, homeowners, City of Chicago inspectors and other City of Chicago officials; resolving building code violations; and obtaining Certificates of Occupancy. City of Chicago employees are prohibited from acting as permit expediters.

11.     Obtaining timely reviews, approvals, and permits is important to developers. Waiting for a lengthy period of time for a review, failing to pass an inspection, or the issuance of a stop work order can have significant financial consequences for developers. These circumstances can preclude developers from starting or completing the work that needs to be done on a project (thereby

6

lengthening the period of time for a project which may add costs or at least delay the time at which a developer can recoup capital tied up in a project), or require developers to do additional work on a project (thereby increasing the cost of the project). For example, as described in detail below, PIEKARZ assisted Garneata in providing things of value, namely glass block windows and a deck, to MILAM in exchange for MILAM providing favorable treatment including a favorable ventilation inspection report related to a Certificate of Occupancy for a property at 6240 South Troy in Chicago. A Certificate of Occupancy is significant from a financial standpoint for the developer because typically a bank will require the Certificate of Occupancy before agreeing to lend money to a buyer for the purchase of the property. Thus, until the Certificate of Occupancy is issued, a developer is unable to sell the property or units in the property and recoup capital put into the project.

## IV.    THE INVESTIGATION

12.    This phase of the criminal investigation began in April 2007, when investigators obtained information concerning a shakedown scheme involving certain individuals, including a particular "expediter," who assisted contractors and developers in the permit application process. Specifically, evidence indicated that a certain building inspector was posting stop work orders on properties and agreeing to lift the order only if the property's owner used this particular expediter. In May 2007, law enforcement agents interviewed the expediter (hereinafter referred to as CW1).[2]

---

[2] CW1 has not been charged with any crime. CW1 understands that he/she will be charged with a violation of federal criminal law. No promises have been made regarding what charges will be brought or what sentence CW1 will receive. CW1 is cooperating with the government in the hopes of receiving a benefit in the determination of what charges will be brought and what sentence will be recommended by the government. CW1 has no previous arrests or convictions. Investigators believe CW1 to be reliable. Although CW1 lied to agents during the initial interview about the nature and scope of CW1's relationship with City employees, CW1 has subsequently spoken with investigators numerous times under proffer protection, and is believed to have provided truthful

13.    CW1 admitted to paying bribes to City employees for a variety of actions, non-actions, favorable reports or to facilitate a quicker-than-normal inspection or review from approximately 2001 through May 2007. CW1 also admitted to CW1's role in accepting bribes from developers and contractors, which CW1 would pass on to City employees.

14.    CW1 began actively cooperating with the government in May 2007. CW1's cooperation has included conducting consensually recorded calls and meetings, as well as playing the role of "bagman" (collecting bribe money from developers and contractors seeking some official act from a City employee or a "priority" handling of a project and paying the bribes to City of Chicago employees).[3]

15.    CW1 has advised law enforcement that it was the practice of developers and contractors with whom CW1 has worked to express a willingness to bribe a City official for actions typically by using coded language, such as "do whatever it takes" (to get an action accomplished).

---

information. CW1 has provided information about bribery activities by over thirty individuals. This information has been corroborated for a number of those individuals by recorded conversations and/or controlled bribe payments.

[3]

On June 1, 2007, CW1 entered into a consent agreement with the USPIS to allow the government to autorecord all communications transmitted or received on CW1's cellular telephone in which CW1 participated (including voicemail messages left for CW1). This agreement allowed CW1 to make and receive calls during the course of this investigation outside of the presence of a Postal Inspector and to conduct CW1's business as an expediter. Under the agreement, CW1 was not allowed to let anyone other than CW1 use the cellular telephone and CW1 was also limited to using the cellular telephone for conducting business as an expediter. All calls were recorded. CW1 had no control over the autorecord and could not manipulate whether a call was recorded or not. Pursuant to court orders issued approximately every thirty or sixty days, beginning on June 4, 2007 and continuing to March 28, 2008, (with the exception of a period of time in January 2008 during which the autorecord was not renewed) signed by either the Chief Judge or Acting Chief Judge, all calls sent or received from CW1's cellular telephone for a period of thirty or sixty days were recorded using the same technology employed in a Title III wiretap but without the requirement of contemporaneous monitoring by law enforcement agents.

CW1 would also use coded language by asking a developer or contractor if CW1 has a "budget" to work with or if this action is a "priority." CW1 would also use coded language in communicating with the City official, by saying, for example, that an "incentive" is available. In other instances, City officials would solicit bribe payments from CW1 initially, and CW1 would then communicate this to the developer or contractor. The developer or contractor would then pay CW1 for expediting services in addition to the amount of any bribes that CW1 was to pay to City officials.

16.     According to CW1, developers and contractors will pay bribes to employees in Zoning for: a) overlooking violations of the Zoning Ordinance; b) increasing the reported number of existing dwelling units in a building being rehabbed to avoid a costly and time-consuming zoning variance process; c) providing a favorable or expedited inspection for a Certificate of Occupancy; and d) expediting a Zoning Compliance Certificate faster than the normal process. CW1 has admitted to paying bribes to zoning inspectors for these actions.

17.     CW1 has told investigators that developers and contractors will pay bribes to DCAP employees for: a) speeding up the Standard Plan Review process; and b) obtaining quicker review appointments. CW1 has admitted to paying bribes to certain clerical employees and technical reviewers in DCAP for these actions.

18.     CW1 has told investigators that developers and contractors will pay bribes to Buildings employees for: a) overlooking construction work which does not conform to City building codes; b) overlooking work performed beyond the scope of a construction permit; c) removing building code violations; d) lifting stop work orders; e) signing off on construction permits without performing an inspection; f) providing favorable or expedited inspections for a Certificate of Occupancy; and g) changing information in the City's mainframe computer system. CW1 has

9

admitted to paying bribes to inspectors in Buildings for these actions.

19.    CW1 has told investigators that developers and contractors will pay bribes to AH employees for: a) expediting the AH process, and b) negotiating a settlement. CW1 has admitted to paying bribes to Buildings employees assigned to AH to facilitate adjudication of Buildings cases in AH in a manner favorable to CW1's clients.

20.    CW1 had performed expediting services for developer/contractor Beny Garneata.[4] As part of CW1's cooperation, CW1 provided information about Garneata and recorded conversations with Garneata. The government subsequently applied for a court authorized wiretap on Garneata's cellular phone. On 10/3/2007, Chief Judge James F. Holderman signed a court order authorizing the interception of wire communications to and from cellular telephone number (312) 617-0013 , subscribed to by M5 Electrical Contractors, 6043 North Milwaukee Avenue, Chicago, IL 60646 (hereinafter referred to as Target Phone One) and used by Beny Garneata. Interception began on 10/4/2007 and continued until 11/2/2007. On 11/6/2007, Chief Judge James F. Holderman signed a court order authorizing the continued interception of wire communications to and from Target Phone One. Interception began on 11/6/2007 and continued to 12/5/2007. On 12/5/2007, Chief Judge James F. Holderman signed a court order authorizing the continued interception of wire communications to and from Target Phone One. Interception began on 12/6/07 and continued to 12/28/07.

---

[4] Garneata is the owner/operator of M5 Electrical Contractors and M3 Plumbing. CW1 first met Garneata in 1998 and has performed expediting services over the past ten years for Garneata and associates of Garneata.

## V.    PROBABLE CAUSE[5]

21.    According to publicly available databases, PIEKARZ is a licensed architect in the

State of Illinois and is doing business under the name of Piekarz and Associates, PC.[6]

22.    According to City of Chicago personnel records, MACARTHUR MILAM has been

employed by the City of Chicago since June 18, 1995 and currently holds the position of Supervisory

Ventilation and Furnace Inspector in the Department of Buildings.  The Department of Buildings is

responsible for advancing public safety through code enforcement.

### *Historical Information from CW1*[7]

23.    CW1 indicated that during the time CW1 was retained by contractor/developer Beny

---

[5] Throughout this Affidavit, I describe various conversations that were recorded pursuant to court authorized wiretap interceptions.  These descriptions often include my understanding of what is being said during such conversations.  This understanding and interpretation of the conversations is based on (I) the contents and context of the conversations, (ii) my experience as a law enforcement officer and the experience of other law enforcement officers in this investigation, including our experience listening to the conversations as a whole, and (iii) the investigation to date, including information obtained from CW1 and others.  All times listed are approximate.  The summaries of the recorded conversations set forth in this Affidavit are based on draft – not final – transcriptions.  Finally, the summaries below do not include all potentially criminal wiretap recorded conversations, or all statements or topics covered during the course of the conversations.

[6] Based on the analysis of the intercepted telephone calls between Garneata and PIEKARZ, described further below, it is believed that PIEKARZ and Garneata have worked together on numerous building projects.  For example, during one such call, on December 3, 2007, Garneata and another individual discussed a building project in which Garneata wanted to do the electrical and plumbing work.  The individual asked if Garneata had an engineer and Garneata said he had PIEKARZ to whom Garneata takes the plans for the project and PIEKARZ does the drawings.  Garneata said PIEKARZ is then paid by the job.

[7] Although CW1 knows MILAM and during CW1's cooperation had recorded telephone conversations with MILAM, CW1 does not have any information regarding MILAM's bribery activities, and the recorded conversations did not pertain to bribes and pertained only to the scheduling of inspections

Garneata, CW1 obtained Certificates of Occupancy for PIEKARZ on various projects. CW1 is aware, based on conversations CW1 had with Garneata, that PIEKARZ provided sky box tickets for Chicago Bulls basketball games to Garneata so that Garneata could bring city inspectors to the game. CW1 advised that it is a common practice for contractors and developers to bribe city officials by providing tickets to sporting events and that CW1 has in the past attended Chicago Bulls basketball games along with certain City of Chicago inspectors who were there as guests of Garneata.

### Conversations Intercepted Over Target Phone One

*Conversations Between Garneata and PIEKARZ, MILAM, and Phyllis Mendenhall [8] Pertaining to the Bribe of MILAM*

24.    On 10/9/2007 at approximately 5:55 pm, a call between an unknown number and Target Phone One was intercepted (Call 286).[9] During this conversation, PIEKARZ told Garneata to talk to "Phyllis" [Mendenhall] "first thing in the morning." Garneata explained to PIEKARZ that "this lady" had not been in the office that day. PIEKARZ further advised Garneata that he has three closings that were held up because the attorneys will not close without the Certificates of Occupancy.

---

[8] Based on City of Chicago personnel records, Phyllis Mendenhall is employed as an Inquiry Aide III with Buildings. According to CW1 as well as employment information obtained through the Inspector General's Office, Mendenhall is responsible for issuing all Certificates of Occupancy for buildings containing four or more units. CW1 advised that CW1 made several cash payments of typically $100 to $200 each to Mendenhall in exchange for the priority handling of Certificates of Occupancy for various properties in the City. On October 25, 2007, CW1, acting at the direction of law enforcement, paid  $200 to Mendenhall in a controlled bribe for the priority handling of Certificates of Occupancy for two properties. On March 28, 2008, CW1, acting at the direction of law enforcement, paid  $100 to Mendenhall in a controlled bribe for the priority handling of a Certificate of Occupancy for one property.

[9] The system did not capture the phone number in this call with Target Phone One and instead reflected a routing number generated by the system. Investigators recognize the voice to be that of PIEKARZ through voice comparison with other calls from a phone known to be used by PIEKARZ.

25.    On 10/10/2007, at approximately 7:25 am, a call to (312)743-7224 from Target Phone One was intercepted (Call 297).[10] During this call, Garneata checked with Mendenhall on the status of a Certificate of Occupancy for 6240 South Troy.  Mendenhall informed Garneata that "you're gonna have to talk to your man." Garneata asked, "Which department?" Mendenhall responded, "Mac [MILAM], ventilation." Garneata confirmed that MILAM was the only inspection not yet completed. Garneata told Mendenhall that he would call MILAM and then call Mendenhall back.

26.    On 10/10/2007, at approximately 7:28 am, a call to another number from Target Phone One was intercepted (Call 298).  During this conversation, Garneata spoke to a particular ventilation inspector [under the supervision of MILAM] to check on the status of the ventilation inspection for 6240 S. Troy. The ventilation inspector informed Garneata that he had already "turned it in" and Garneata responded that "she [Mendenhall] never got it." Garneata further stated that "this man [PIEKARZ] is desperate to get CO."  The inspector told Garneata that he would check at the office and call Garneata at his convenience.

27.    On 10/10/2007, at approximately 7:29 am, a call to (312)743-3573 from Target Phone One was intercepted (Call 299).[11]  During that conversation, Garneata spoke with supervisory

---

[10]

Information establishing Mendenhall as the user of (312)743-7224 includes the following: (1) City of Chicago records list this as the number for the Department of Buildings, Certificates of Occupancy – the department where Mendenhall works; and (2) investigators have done a voice comparison of phone calls intercepted at this number with consensually recorded calls between CW1 and Mendenhall at Mendenhall's cell phone number during which CW1 has addressed Mendenhall as "Phyllis" and determined the voice to be the same.

[11]

Information establishing MILAM as the user of (312)743-3573 includes the following: (1) City of Chicago records list this number as the office telephone number for MILAM; (2) Garneata has referred to the user of the phone by MILAM's first name, "Mac;" (3) investigators intercepted calls between Garneata and MILAM at this number discussing the construction of a wood deck on MILAM's residence and subsequently surveilled deck construction at a residence listed as the home

ventilation inspector MILAM regarding the inspection paperwork for 6240 South Troy. Garneata advised MILAM that he talked to "Phyllis" and that she was waiting for the "paperwork for 6240 S. Troy." Garneata further explained that he spoke to the particular ventilation inspector and that the inspector said that he "gave it in already." Garneata explained to MILAM that ventilation is "the only department that needs to be resolved as everyone else took care of it." MILAM informed Garneata that he will "take care of it."

28.     On 10/10/2007, at approximately 8:54 am, a call from (312)617-6446 to Target Phone One was intercepted (Call 315).[12] During that conversation, MILAM talked to Garneata about the possibility of getting glass block windows for MILAM's residence. MILAM asked Garneata if he knows "any guys south that do glass block." Garneata responded that he did and asked MILAM when he needed it done. MILAM told Garneata that he needed it done as soon as possible and asked Garneata to have a guy give him a call. MILAM further explained it was for three windows. Garneata said that he would "take care of it" for him and have someone call MILAM and meet

_____

address of MILAM according to City of Chicago records; (4) investigators have done a voice comparison of phone calls intercepted at this number with consensually recorded calls between CW1 and MILAM at a different office number, during which CW1 has addressed MILAM as "Mac," and determined the voice to be the same; (5) investigators have compared the voice of the user of this number with the user of (312) 617-6446 and determined it to be the same.

[12]

Information establishing MILAM as the user of (312) 617-6446 includes the following: (1) City of Chicago records list this number as the cellular telephone number for MILAM; (2) Garneata has referred to the user of the phone by MILAM's first name, "Mac;" (3) investigators intercepted calls between Garneata and MILAM at this number discussing the construction of a wood deck on MILAM's residence and subsequently surveilled deck construction at a residence listed as the home address of MILAM according to City of Chicago records; (4) investigators have done a voice comparison of phone calls intercepted at this number with consensually recorded calls between CW1 and MILAM at a different office number, during which CW1 has addressed MILAM as "Mac," and determined the voice to be the same; (5) investigators have compared the voice of the user of this number with the user of (312) 743-3573 and determined it to be the same.

14

MILAM there so they can "coordinate what you need done." Garneata then asked MILAM if he had "talked to Phyllis." MILAM responded, "That's on." Garneata replied, "You are the best."

29.    On 10/10/2007, at approximately 9:16 am, a call from (312)617-6446 to Target Phone One was intercepted (Call 317). During this conversation MILAM told Garneata that he wanted to do "a landing type deck." Garneata responded that it was "not a problem" and "anything you need done is going to be done." MILAM responded that he wants to "get a price on those two things"and Garneata told him, "Don't worry about it." Garneata added that he would "be talking to him" [PIEKARZ] and would come there with him so "we can resolve it on the spot."

30.    On 10/19/2007, at approximately 3:24 pm, a call from (312) 743-7224 to Target Phone One was intercepted (Call 1379). During that conversation, Mendenhall told Garneata that PIEKARZ "picked up that certificate" of occupancy. Mendenhall also informed Garneata that "boilers say that they have to come out on Monday"and asked Garneata if someone could be available at the property [indicating that Mendenhall improperly issued the Certificate of Occupancy in violation of the Building Code to PIEKARZ despite the fact that a boiler inspection had not yet occurred].

31.    On 10/20/2007, at approximately 10:37 am, a call from (312) 860-0009 to Target Phone One was intercepted (Call 1415).[13] During the conversation, Garneata informed PIEKARZ

---

[13] Information establishing PIEKARZ as the user of (312) 860-0009 includes the following: (1) the subscriber to this phone number is Piekarz Associates, P.C., 2880 North Elston Ave., Chicago, Illinois; (2) Garneata in calls has addressed the user of the phone as "Ronnie P," which appears to be a nickname for RON PIEKARZ (3) Garneata and PIEKARZ had several calls described in detail below concerning PIEKARZ renting a Chicago Bulls skybox for a particular game and information confirmed that the skybox was rented in the name of RONALD PIEKARZ and Garneata was surveilled in that skybox that night.

that "she" called Garneata yesterday and told Garneata to let PIEKARZ  know that "Monday, between 8 and 12, for the boiler guy. He is coming over, just to sign off." Garneata explained that "she gave you that" because of Garneata and because "we are nice people" and because PIEKARZ is "a hot stud." PIEKARZ informed Garneata that "They met with Mac yesterday.  We measured three glass block windows.  And we are going to do a 10 x 10 wood deck." Garneata responded "Perfect." PIEKARZ stated "We will just get it done, okay?" Garneata responded "just get it done," and added "we want to keep them [City of Chicago employees] happy." PIEKARZ replied that "they are happy to begin with" but "on top of that, you know we are just going ahead and do that stuff."

32.     On 11/6/2007, at approximately 3:49 pm, a call from (312) 860-0009 to Target Phone One was intercepted (Call 3063).  During the call, Garneata asked PIEKARZ if he talked to "her" [a supplier] about getting the glass block windows.  PIEKARZ stated he forgot but would call and get back to Garneata.  The next day, on 11/7/2007 at approximately 7:51 am, a call from (312) 617-6446 to Target Phone One was intercepted (Call 3110).  During the call, MILAM told Garneata that Garneata's workers were at MILAM's house installing the glass block windows.  MILAM stated that he wanted to give the workers a money order as a down payment, and Garneata told MILAM not to worry about it.  Garneata explained that at the end of the job, Garneata would give MILAM the name of the glass block window supplier, so MILAM could pay for the materials.  Garneata assured MILAM that he will "protect" MILAM, and won't let him "get in trouble."  Garneata stated that he understood what MILAM wanted to avoid, and he agreed with MILAM and said he would help him with that.  Garneata then explained he wanted them to get all the materials from the same supplier, including the wood for the deck, which they would start on that week.  Garneata explained that as soon as they did that, he, Garneata,  would get the final bill "for the glass and for the wood"  and

16

"that's the only thing you gotta pay for" [MILAM would pay for the materials and Garneata would pay for the labor].  Garneata told MILAM, "I'm here to help you. I'm not gonna never hurt you. I hope you understand this."  Garneata reiterated that he was there to help MILAM and needed him around another 30 years.

33.    That same morning, at approximately 9:10 a.m., investigators established a surveillance on the home of MILAM.  Investigators observed and videotaped three construction laborers who appeared to be installing glass block windows on the north side of MILAM's home at ground level.  Investigators also observed and videotaped a pile of new construction lumber neatly stacked in the backyard of the home. In front of MILAM's home was a black pick-up truck with Illinois license plates E153582, registered to MILAM.  Also parked in front of the house was a white Dodge panel van registered to a company that investigators have determined is in the construction business.[14]

34.    On 11/13/2007, at approximately 2:54 pm, a call between an unknown number and Target Phone One was intercepted (Call 4166).[15]  During the call, Garneata asked MILAM about the inspection of a porch needed at 620 West Barry. Garneata said that the court gave them thirty days for the inspection.  MILAM agreed that he would look into it.  Garneata asked MILAM if the glass block windows "came out okay." MILAM responded, "That was real good."  Garneata and MILAM then discussed the railings on the deck that was being built for MILAM.  During the conversation,

---

[14]

On 2/5/08, investigators conducted a spot check of the MILAM residence and observed a newly constructed deck located in the back yard.

[15]

Investigators recognize the voice to be that of MILAM through voice comparison with other calls from phones known to be used by MILAM.

MILAM appeared to be concerned about the cost of the railings, indicating that he, MILAM, would be paying for at least some portion of the deck. As indicated by earlier calls, Garneata had already informed MILAM that Garneata is only going to charge MILAM for the materials and not the labor. A short while later, at approximately 3:11 pm, a call from (312) 925-4834 to Target Phone One was intercepted (Call 4176).[16]  MILAM told Garneata that he thought he had determined who the inspector on the Barry project was.  Garneata explained that all he needed was to have the inspector "come and finalize this permit."  MILAM agreed to talk to the inspector the next day.  MILAM asked Garneata about the deck. MILAM stated he wanted to do the least expensive option. Garneata responded that he would let MILAM know.

      35.     On 11/14/2007 at approximately 9:38 am, a call from Target Phone One to (312) 860-0009 was intercepted (Call 4247).  During the call, Garneata discussed with PIEKARZ the issue concerning the railings on the deck that was being built and then confirmed that MILAM was happy with the "other stuff" [the glass block windows].

      36.     Later that morning, at approximately 10:45 a.m., a call from (312) 925-4834 to Target Phone One was intercepted (Call 4283). MILAM left a voicemail for Garneata stating that he would call back to answer Garneata about the address Garneata had asked about.  That afternoon, at approximately 1:17 p.m., (Call 4307), Garneata spoke with MILAM, who said there was a hearing scheduled for the address of 620-628 Barry that Garneata was asking about. MILAM said "the guy's gonna come out" [the inspector would come out and do the inspection] a week before the hearing,

---

[16]  Information establishing MILAM as the user of (312) 925-4834 includes the following: (1) the phone is subscribed to in the name of MACARTHUR MILAM; (2) investigators have compared the voice of the user of this phone with calls intercepted on other phones known to be used by MILAM as well as the consensually recorded conversations with CW1 and determined that the voices are the same.

which is scheduled for the 28th. MILAM told Garneata to call him on the 21st to remind MILAM about it.

37.    On 11/20/2007, at 9:51 a.m., a voicemail from (312) 925-4834 to Target Phone One to was intercepted (Call 4987). MILAM left a voicemail message for Garneata about the 620 West Barry property and said that he would talk to "the Conservation guy" to "make sure the guy" gets "over there" [inspector from conservation would be over at the property to do an inspection]. At approximately 9:52 a.m., (Call 4989), Garneata called MILAM back, and MILAM asked for a contact name and number to give to the guy. Garneata said to have him call Garneata. At the end of the conversation, MILAM said, "Don't forget about the other thing, alright" [possible reference to the Bears tickets MILAM was trying to get from Garneata discussed in Call 5964 below]. Garneata replied, "No sir. Don't worry about it."

*Conversations Between PIEKARZ, MILAM and Garneata Pertaining to December Bribes*

38.    On 12/13/07, at approximately 10:56am, a call from Target Phone One to (312) 860-0009 was intercepted (Call 8582). Garneata told PIEKARZ not to forget about the other things they talked about. PIEKARZ asked which ones and Garneata responded "the ones with the little gifts attached to it" [December bribes needed to pay the inspectors]. PIEKARZ responded that he had not even started thinking about Christmas yet and that it is only the 13th. Garneata said he likes to take care of it before things get crazy.

39.    On 12/18/07, at approximately 6:17pm, a call from Target Phone One to (312) 860-0009 was intercepted (Call 9417). Garneata asked PIEKARZ to meet Friday or Saturday so they could "take care of those people for Christmas" [pay December bribes to the inspectors]. PIEKARZ said he was trying to work that out in the next two days. Garneata responded, "this way, Friday and

19

Saturday" Garneata can "go to their houses" because Garneata has their addresses. PIEKARZ told

Garneata he was working on it.

40.     On 12/21/07, at approximately 1:24 pm, a call from Target Phone One to (312) 860-

0009 was intercepted (Call 9783).  PIEKARZ told Garneata that he had "some envelopes" for

Garneata. Garneata said he was on his way and would see PIEKARZ shortly.  At approximately 1:45

p.m., a call from Target Phone One to (312) 925-4834 was intercepted (Call 9802).  Garneata asked

if MILAM was going to be around.  MILAM said that he would be at home the following day.

Garneata told him to keep his phone on and that Garneata would call him the following day because

he wants to see MILAM.

41.     The following day, on 12/22/2007, at approximately 8:37 a.m., a call from Target

Phone One to (312) 617-6446 was intercepted (Call 9910). Garneata left MILAM a message asking

for a call back. Two days later, on 12/24/2007 at approximately 8:34 a.m., a call from Target Phone

One to (312) 617-6446 was intercepted (Call 10064).  During the conversation, Garneata told

MILAM that he would call MILAM when he is coming his way . Garneata also asked MILAM to

check on 4124 North Kedzie and see what date they have court. MILAM said he would let Garneata

know.

42.     On 12/24/2007, at approximately 10:18 a.m., a call from (312) 617-6446 to Target

Phone One was intercepted (Call 10093). Garneata told MILAM that he was on his way.  MILAM

then referenced the 4124 Kedzie property Garneata had asked about two days earlier (Call 10064)

and asked if it was a "conservation complaint."  Garneata confirmed that it was.  MILAM said that

he was going to have to "ask one of those guys about that." Garneata asked if MILAM could see if

they could "eliminate it" because the property belonged to Garneata's relative.  MILAM responded

20

that he did not think so, but he would see what the conservation inspectors said. MILAM then asked

if Garneata remembered the job "you guys" were doing for him. MILAM said that he knows they

cannot do anything with the deck in the wintertime. Garneata said he would "take care of it" and that

"it's in the works." Garneata added that as long as he was around, MILAM would not have "to

worry."

      43.    That same morning at 10:25 a.m., a call from Target Phone One to (312) 718-0338

was intercepted (Call 10104). Garneata asked Mendenhall where he could meet her, because he did

not want to "walk in there with envelopes" because people "will look at it and question it." They

arranged to meet. At 10:35 a.m., a call from Target Phone One to a number used by Individual A,

another City employee, was intercepted (Call 10112).[17] Garneata had a conversation with Individual

A and told him that he "met with Phyllis" and gave her his envelope and "Mac's and some other

people's." That afternoon, at approximately 2:38 p.m., a call from Target Phone One to (312) 617-

6446 was intercepted (Call 10160). Garneata spoke with MILAM and said that he hoped MILAM

is "happy with the beautiful lady" Garneata sent over to see him [asking if MILAM is happy with

the bribe in the envelope that was delivered to him by Mendenhall]. MILAM thanked Garneata.

*Conversations Between Garneata and PIEKARZ and others, Pertaining To Sports Ticket Bribes*

      44.    On 10/19/07, at approximately 2:45 pm, a call from Target Phone One to (312) 860-

0009 was intercepted (Call 1373). Garneata mentioned the Bears [Chicago Bears Football

team] and then asked PIEKARZ if they were going to the game next Sunday. PIEKARZ responded

---

[17] Individual A was a employee in the Department of Buildings. CW1 met Individual A through
Garneata and was present on two occasions with Individual A in skybox seats at a Chicago Bulls
basketball game as guests of Garneata.

that it did not look good for four and was a possibility for two. PIEKARZ added that the Bulls were definitely in for the next week or two. PIEKARZ said he was going to get Garneata "some" even before the season starts to get "everybody" in "the right spirits." Garneata responded that would be good.

45. On 11/26/2007 at approximately 1:03 pm, a call from Target Phone One to (312) 860-0009 was intercepted (Call 5964). During the call, PIEKARZ asked Garneata to, if he talks to their "girlfriend," [Mendenhall] let PIEKARZ know about "the C of Os." Garneata stated that she asked him for tickets to Sunday's [Bears] game for herself, MILAM, and their spouses. Garneata stated that he did not want to promise her, but he told her that he would "do my best." PIEKARZ stated that the tickets may be gone already, but he would see what he could do. Garneata stated that it would be nice for her to go, and it would "make her happy." Garneata added that she should have Garneata's Certificate of Occupancy for him in the next day or two.

46. On 11/28/2007 at approximately 7:56 a.m., a call from (312) 860-0009 to Target Phone One was intercepted (Call 6206). During the call, Garneata informed PIEKARZ that he talked to them [Mendenhall and MILAM] and not to worry about it because one of them had a death in the family. Garneata added that if PIEKARZ can "do it" for next month, that would be fine. PIEKARZ asked if they liked basketball, and Garneata replied that they did. PIEKARZ said that he would try and get something for basketball.

47. On 12/07/07, at approximately 2:59 pm, a call from (312) 860-0009 to Target Phone One was intercepted (Call 7794). During the conversation, PIEKARZ talked to Garneata about acquiring a penthouse sky box at the United Center for Garneata for a Chicago Bulls game on 12/18/07. PIEKARZ told Garneata that he thinks he is "almost squared away for the 18th."

PIEKARZ said "they had one left" and PIEKARZ believed he got it. PIEKARZ said he was going to work on it when he gets back to his office. According to the order form for the rental of a suite for the 12/18/07 Chicago Bulls game, received from the United Center, RON PIEKARZ is listed as the licensee and contact. The form listed the cost of the rental at $5,750. In a follow up phone call at 4:27 pm (Call 7839), PIEKARZ described where the sky box is located in the United Center and asked if he should book it. Garneata replied "Yeah."

48.    On 12/10/07, at 1:56pm, a call from (312) 860-0009 to Target Phone One was intercepted (Call 8031). PIEKARZ spoke with Garneata and confirmed that he booked the sky box. Later that afternoon, at 2:21pm (Call 8036), Garneata asked PIEKARZ about picking "up that stuff" "for those guys." PIEKARZ said he would "get it" to Garneata that week. On 12/18/07, investigators surveilled PIEKARZ' sky box at the United Center. Investigators observed Garneata in the sky box during the Bulls game, accompanied by, among others, individuals identified as a Buildings plumbing inspector and two Buildings ventilation and furnace inspectors.

49.    Investigators obtained information from two confidential sources who are both professionals in the marketing and sales of new construction and condominium rehabilitations in Chicago with fourteen years of experience. The sources informed investigators that the typical profit margin for a developer on the sale of a project that is a multi-unit condominium rehabilitation or new construction condominium building located in Chicago is at least 20%. The profit margin range can vary based upon variables including the original cost of the land, construction costs, and time on the market before sale. One of the sources, who is familiar with the underlying financing of such projects, informed investigators that lenders generally require that the developer establish a minimum of a 20% profit cushion before the lender will finance the project. Based upon a review

of publicly available information, the property at 6240 South Troy is an eight unit condominium conversion marketing the units as starting at a sale price of $139,000.

50.    A review of the City of Chicago records and the City's web site disclosed that the City of Chicago is a unit of local government that received in excess of $10,000 in federal funding in a twelve month period from December, 2006 through December, 2007.

51.    Based on the facts described above, I submit that there is probable cause to believe that RONALD PIEKARZ and MACARTHUR MILAM conspired with Beny Garneata, Phyllis Mendenhall and others to commit bribery, in violation of Title 18, United States Code, Section 666, all in violation of Title 18, United States Code, Section 371.


Tom Simon
Special Agent, Federal Bureau of Investigation


Subscribed and sworn to me this
____21____ day of May, 2008

Martin C. Ashman
U.S. Magistrate Judge

24